UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT
_____

JONATHAN A. BLOOM,

                Plaintiff,

        v.                                    Civil No. 5:16-cv-121

ALEX AZAR,
Secretary of the U.S. Department of Health
and Social Services,

                Defendant.
_____

### DR. BLOOM'S REPLY RE: MOTION FOR FEES AND COSTS

In its Opposition, the Secretary concedes that all the elements necessary for an Equal Access to Just Act ("EAJA") award are present and challenges only whether the Secretary's position was substantially justified and whether a non-Cost of Living Adjustment ("COLA") fee enhancement is appropriate.

The Secretary has not met his burden to show a continuous glucose monitor ("CGM") is not "primarily and customarily used for a medical purpose" was a substantially justified position. On its face, that position was and is non-sensical. As this Court and other courts recognize, the plain reading of the Statute, regulations and guidance did not support the Secretary's position. The Secretary's effort to explain away 55 negative Administrative Law Judges ("ALJ") decisions, the negative ruling of its own Civil Remedies Division, and the final, negative decision of one District Court (and the admonition of another) is unpersuasive. Further, the Secretary's alleged "consistency" in maintaining its unreasonable position is evidence in support of an EAJA award, not rebuttal.

With respect to fee enhancement, the Secretary does not dispute a COLA adjustment. The Secretary's claim that any legal aid counsel could have handled this matter is both inaccurate and belied by the Secretary's own positions in this case. The Parrish firm's usual and customary rates should apply.

## I.    The Secretary Has Not Made A "Strong Showing" of "Substantial Justification"

To meet his burden, the Secretary was required to make a "strong showing" that his position had "a reasonable basis both in law and fact." *See Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Further, "substantially justified" means "more than merely undeserving of sanctions for frivolousness; that is assuredly not the standard for Government litigation of which a reasonable person would approve." *Id.* at 566. The Secretary did not meet his burden.

The Secretary needed to show that a reasonable person could conclude that a CGM is not "primarily and customarily used for a medical purpose." As this Court noted in its decision: "No record evidence suggests that CGMs are used for any nonmedical purpose. The Secretary has not stated what nonmedical purpose a CGM might serve." Decision at 19. In his opposition papers, the Secretary offered nothing in this regard. There has never been any "genuine dispute" that a CGM is "primarily and customarily used for a medical purpose." *Pierce*, 487 U.S. at 565. No reasonable person could conclude that a CGM "does not serve a medical purpose," as the Secretary contends. Opp. at 7.[1] Thus, the Secretary failed to meet his burden.

---

[1] Indeed, even in this filing, the Secretary inaccurately states that Dr. Bloom does not use a CGM to control his diabetes and make treatment decisions. As the record clearly demonstrates, and the name implies, a CGM is used for the continuous management of his diabetes and without which he cannot control his diabetes. Further, throughout the litigation, the Secretary never rebutted the assertion that the "statutory and regulatory language guiding all coverage decisions" provided for the coverage of numerous medical monitors and tests that required confirmatory testing, thereby dispelling his argument that the use of other devices or interventions somehow deprived a device of a medical purpose.

Moreover, beyond the substantive issue, the very idea of the *same litigant* litigating the *same issue* through at least the ALJ stage 13 times (as Dr. Bloom has been forced to do) is not substantially justified.

Rather than the actual language of the regulation, the Secretary contends that his position was substantially justified because the Secretary relied on the non-statutory/non-regulatory term "precautionary." There is nothing to that. The Secretary has never offered a definition of "precautionary" that makes any sense or a reason that word should be added to the regulation. As such, the Secretary's position has a certain Lewis Carroll quality to it.[2]

At base, the Secretary offers that he grafted the word "precautionary" to the regulation (without notice and consent).[3] Thereafter, the Secretary incorporated the invented term into documents (the Article and the Medicare Benefit Program Manual) that were not subject to notice and comment. When ALJs, district courts, or the Secretary's own Civil Remedies Division told the Secretary that his position was not reasonable, the Secretary ignored them. Now, the Secretary contends that his position was substantially justified because he relied on the invented term he incorporated in the documents. That position is without merit. In both the *Finigan* and *Whitcomb v. Burwell* decisions, when the courts remanded the cases, the courts explicitly advised the Secretary that such documents were not entitled to deference. Indeed,

---

[2] 'When *I* use a word,' Humpty Dumpty said, in rather a scornful tone, 'it means just what I choose it to mean—neither more nor less.'" Lewis Carrol, *Through the Looking Glass*, Chap 6, p. 205 (1934).

[3] During the hearing held on December 19, 2017, the Court asked why there was no NCD or LCD related to CGMs given the relative maturity of the technology and widespread need for it. Dr. Bloom is not privy to the reason for the Secretary's hostility to CGMs. However, were the Secretary to promulgate an NCD or LCD excluding CGMs, those policies would be subject to notice and comment requirements and litigation. Adopting the same policy by fiat (or ruling) avoids the notice and comment requirements and forces challengers to litigate cases individually through district court after extraordinary delay, with the Secretary contending all the while that he is not bound by negative decisions. Few litigants have the expertise, resources, and patience to devote to that endeavor.

when seeking a remand,[4] the Secretary argued that he may have committed legal error by relying

on the Article which now he asserts he reasonably was entitled to rely on[5] although two courts

previously told him he could not.

## II.    Alleged "Consistency"

Frankly, Dr. Bloom does not even follow the Secretary's "consistency" argument.  Opp.

at 9.  As a factual matter, the Secretary has not been consistent.  As previously noted, before the

claims at issue in this case, Dr. Bloom received a series of favorable ALJ coverage decisions that

were not appealed.  Dr. Bloom also received other favorable ALJ coverage decisions after these

denials.  This case represents the anomaly where Dr. Bloom received a negative ALJ decision or

the Secretary actually appealed a favorable ALJ decision.

Moreover, assuming *arguendo*, the Secretary consistently advanced the same erroneous

position in the face of numerous ALJs, courts, etc. telling him his position was unfounded, that

would be evidence *in favor* of an EAJA award.  That would represent an unreasonable refusal to

acknowledge that his position was erroneous.   "Yes, I was wrong, but I have always been wrong

and I refused to listen when everyone else said I was wrong" is not evidence that the Secretary's

position was substantially justified.  That is evidence that the Secretary's position was *not*

substantially justified.

Although Dr. Bloom does not understand how it helps the Secretary's argument, the

Secretary appears to believe Centers for Medicare Services ("CMS") Ruling No. 1682-R bolsters

his case.  Opp. at 9.  The opposite is true.  In the cases to date, the Secretary contended that

anything that does not replace fingersticks is not durable medical equipment ("DME") based on

---

[4] *See* Defendant's Motion for Remand Pursuant to the Sixth Sentence of 42 U.S.C. §405(g) and Memorandum of Law, Docket No. 9.

[5] Opp. at 7.  The courts previously ruled that Articles are not entitled to deference.  Thus, the Secretary cannot now assert that reliance on the same supports his position.

the non-statutory/regulatory term "precautionary." In the face of numerous defeats, the Secretary

promulgated CMS Ruling No 1682-R. There, the Secretary contends that anything that does not

replace fingersticks is not DME, based on the non-statutory/regulatory term "therapeutic" (i.e.,

"not precautionary in nature").[6] This similarity is not lost on reviewing courts. See Exhibit F at

11 ("same rationale", awarding fees). Rather than evidence of "substantial justification," this is

evidence of the Secretary's intransigence.

## III.   String of Losses

The Secretary's Opposition contains two extensive quotes from *Pierce v. Underwood*,

487 U.S. 552 (1988). In particular, the Secretary cites to the following passage:

> Obviously, the fact that one agreed or disagreed with the Government does not establish
> whether its position was substantially justified. Conceivably, the agency could take a
> position that is not substantially justified, yet win; even more likely, it could take a
> position that is substantially justified, yet lose. **Nevertheless, a string of losses can be
> indicative; and even more so a string of successes.**

*Id*. at 565 (emphasis added). However, when the Secretary quotes this passage (Opp. at 4, 10),

the portion in bold is omitted. Although the Supreme Court did not define "a string of losses,"

55 negative ALJ decisions, a finding of unreasonableness by the Medicare Civil Remedies

Division, and a final District Court decision, would appear to meet any definition.

In response, the Secretary offers that, in his view, ALJ decisions are not precedential.[7]

Opp. at 9-10.[8] That adds nothing to the inquiry. Regardless of whether ALJ decisions

affirmatively bar the Secretary from re-litigating an issue, more than 40 ALJs told the Secretary

---

[6] As noted above, by issuing a Ruling (rather than an NCD or LCD), the Secretary avoided a notice and comment period and direct challenge to the Ruling through litigation.

[7] ALJ decisions may not be precedential because they are supposed to be based on the facts of a particular beneficiary, and not broad coverage policy. However, when adjudicating CGM claims, the Secretary has not premised denial on the medical condition of any Medicare beneficiary. Instead, the Secretary's denials have been based on a policy of non-coverage and that policy has been rejected by the ALJs.

[8] The Secretary's effort to rely on *Whitcomb v. Burwell*, 2015 WL 5254518 (E.D. Wisc. Sept. 9, 2015) is misplaced. That Court knew of only two other ALJ decisions and issued its decision before the Civil Remedies Division of HHS told the Secretary that his position was not valid under the reasonableness standard.

his position was unfounded more than 50 times.  Further, as noted above, multiple ALJs had specifically ruled in favor of Dr. Bloom.  Nevertheless, the Secretary continued to advance the same position.  That was not substantially justified.

In addition to the 40 ALJs, to date, three district court judges have addressed this issue. Two flat out told the Secretary he was wrong and one told the Secretary his position was "head scratching" when remanding.

The Secretary suffered a string of losses indicative of the fact that his position lacked substantial justification.

## IV.    Deterrence

As noted above, before this case was filed, numerous ALJs had issued numerous decisions rejecting the Secretary's position.  Still the Secretary was not deterred.  On the same day that this suit was filed, the Secretary's own Civil Remedies Division told the Secretary that his position was unreasonable.  Still the Secretary was not deterred.  One month later, the *Finigan* court told the Secretary his position was "head-scratching."  Still the Secretary was not deterred.  In October 2017, the Court in *Whitcomb* told the Secretary that his position was arbitrary and capricious.  Still the Secretary was not deterred.  In January 2018, the *Whitcomb* decision became final.  Still the Secretary was not deterred.

In his opening papers, Dr. Bloom showed that *after* this Court's decision, he received a coverage denial for his CGM supplies.  Mot. at 8-9, Exhibit D.  In response, the Secretary offers that the supplies were delivered *before* this Court's decision.  Opp. at 10, n. 8.  So what? Coverage decisions come after supplies are delivered.  *After* both the *Whitcomb* court and this Court told the Secretary his position was without merit, the Secretary was not deterred and continued issuing denials on the same erroneous grounds.

6

On March 15, 2018, the Secretary filed his fees opposition brief telling this Court that the "allegation" that "the Secretary has continued to deny Dr. Bloom's claims on the same grounds" was "not accurate." Opp. at 10, n. 8. Yet, on that very same day, the Secretary sent Dr. Bloom another denial of CGM coverage on the grounds that it is "precautionary." *See* Exhibit E at 4. Respectfully, it is the Secretary's representation to the Court that is not accurate.

To date, nothing has served to deter the Secretary from advancing this arbitrary and capricious position. Deterring the government from advancing positions like this is one purpose of an EAJA award.

## V.      Fee Enhancement

The Parrish Law Offices seeks only the fees reasonably incurred in this matter, using its usual and customary rates. In opposition, the Secretary advances two, mutually exclusive positions. First, when arguing for extraordinary deference, the Secretary contends that the statutes/regulations are "complex", "large and complex", and require "informed judgments", "technical expertise", and "considerable expertise" to interpret. Opp. at 7, 8, n. 4. Then, when resisting a fee enhancement, the Secretary contends that any "attorney with an understanding of administrative and federal court litigation would *likely* have been able to adequately represent Plaintiff[.]" Opp. at 13 (emphasis added). At most, only one of those positions could be correct.

In truth, as detailed in Dr. Bloom's opening papers, the Parrish Law Office's distinctive knowledge and specialized skill in handling Medicare CGM cases was necessary for this litigation. *See, e.g., Connecticut State Dept. of Social Services v. Thompson*, 289 F.Supp. 198, 204-5 (D. Conn. 2003). For example, because ALJ decisions are generally not publicly available, it was only the Parrish law firm's distinctive knowledge of the 55 negative ALJ decisions that allowed that evidence to be brought in this case. It was that background (and Ms.

Parrish's technical background) that allowed Dr. Bloom to rebut the Secretary's sustained efforts to thwart coverage, including through delay by remand.

In a footnote, the Secretary appears to suggest legal aid organizations could have handled this matter. Opp. at 14, n. 9. This reflects unfamiliarity with the Record in this case. As shown by Record AR2 at 2, originally, Dr. Bloom was represented by Vermont Legal Aid and that representation continued through March 2016. However, Vermont Legal Aid lacked the resources and expertise to handle a matter like this and referred Dr. Bloom to the Parrish firm.

The Secretary complains about the fee enhancement for Mr. Pistorino. As noted in Dr. Bloom's opening papers, Mr. Pistorino's billing rate is lower than Ms. Parrish's. Thus, Ms. Parrish was able to utilize Mr. Pistorino's background and lower billing rate (with her guidance) to handle this matter in a lower cost fashion. Had Ms. Parrish done the same work herself, that would have resulted in more than $1,000 additional expense.[9]

## VI.    Updated Fee Calculations

The fee calculations provided in Dr. Bloom's opening briefs have been revised to reflect the additional expenses incurred in the fee briefing itself (as well as the briefing on supplemental jurisdiction). *See* Exhibit B Amended. The revised fees are as follows:

---

[9] The Secretary questions whether some included costs are related to the case and notes that ALJ Chin's [sic] decision was not part of the Council decisions in the administrative record. Opp. at 14. That was time spent reviewing a decision from another ALJ finding CGM coverage and whether and how to integrate that decision in this case.

| Usual Billing Rates | | | | | | |
|---|---|---|---|---|---|---|
| **Name** | **Hours** | **Fees** | **Expenses** | **Total** | **Alter & Amend** | **New Total** |
| Sheehey Furlong & Behm P.C. | 41.1 | $11,282.50 | $854.65 | $12,137.15 | $70.00 | $12,207.15 |
| Parrish Law Offices | 201.7 | $93,098.23 | $1,533.66 | $94,631.89 | $21,186.00 (42.8hrs@$495) | $115,817.89 |
| **Total** | **242.80** | **$104,380.73** | **$2,388.31** | **$106,769.04** | **$21,256.00** | **$128,025.04** |

| Cost of Living Adjustment (COLA) | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Name** | **Hours** | **Fees** | **Paralegal Fees** | **Expenses** | **Total** | **Alter & Amend** | **New Total** |
| Sheehey Furlong & Behm P.C. | 41.1 | $7,025.72 | $775.00 (6.2hrs@ $125) (Time Inc. in total) | $854.65 | $8,655.37 | $40.26 | $8,695.63 |
| Parrish Law Offices | 201.7 | $40,604.23 | | $1,533.66 | $42,137.89 | $8,616.07 (42.8hrs@$201.31) | $50,753.96 |
| **Total** | **242.8** | **$47,629.95** | **775.00** | **$2,388.31** | **$50,793.23** | $8,656.33 | **$59,449.59** |

| Parrish Law Offices Usual Billing Rate & COLA Rates for SFB P.C. and Ms. Noonan | | | | | | |
|---|---|---|---|---|---|---|
| Name | Hours | Fees | Expenses | Total | Alter & Amend | New Total |
| **Sheehey Furlong & Behm P.C.** | **41.1** | **$7,800.72** | **$854.65** | **$8,655.37** | **40.26 (.2@$201.31) (Time Inc. in Total)** | **$8,695.63 *** |
| *Craig S. Nolan @201.31* | *26.1* | *$5,254.19* | | | | |
| *Justin A. Brown @201.31* | *8.8* | *$1,771.53* | | | | |
| *Donna M. Sims, Paralegal @125* | *6.2* | *$775.00* | | | | |
| **Parrish Law Offices** | **201.7** | **$93,098.23** | **$1,533.66** | **$94,631.89** | **$21,186** | **$115,817.89** |
| *Debra Parrish @$525* | *55.23* | *$28,995.75* | | | | |
| *Debra Parrish @$500* | *36.75* | *$18,375* | | | | |
| *Debra Parrish @$490* | *10.08333* | *$4,940.83* | | | | |
| *James Pistorino @$495* | *70.4* | *$34,848* | | | *$21,186 (42.8hrs@ $495)* | |
| *Bridget Noonan @$201.31* | *29.5* | *$5,938.65* | | | | |
| **Total** | **242.8** | **$100,898.95** | **$2,388.31** | **$103,287.26** | **$21,226.26** | **$124,513.52** |

**\*Includes Paralegal Time.**

## CONCLUSION

An EAJA award is appropriate in this case and that award should reflect the Parrish Law firm's usual and customary billings rates.

Dated at Burlington, Vermont this 28th day of March, 2018.

**JONATHAN A. BLOOM**

By:      */s/ Debra M. Parrish*
Debra M. Parrish, Esq. (*pro hac vice*)
Bridget M. Noonan, Esq. (*pro hac vice*)
PARRISH LAW OFFICES
788 Washington Road
Pittsburgh, PA  15228
debbie@dparrishlaw.com
bridget@dparrishlaw.com

By:      */s/ Craig S. Nolan*
Craig S. Nolan, Esq.
SHEEHEY FURLONG & BEHM P.C.
30 Main Street, 6th Floor
P.O. Box 66
Burlington, VT  05402-0066
(802) 864-9891
cnolan@sheeheyvt.com

## CERTIFICATE OF SERVICE

I, Craig S. Nolan, counsel for Jonathan A. Bloom, do hereby certify that on March 28,

2018, I electronically filed with the Clerk of Court the following document:

### DR. BLOOM'S REPLY RE: MOTION FOR FEES AND COSTS

using the CM/ECF system.  The CM/ECF system will provide service of such filing via Notice

of Electronic Filing (NEF) to the following NEF parties:

> Melissa A.D. Ronaldo, Esq.
> Assistant United States Attorney
> P.O. Box 570
> Burlington, VT 05401
> (802) 951-6725
> Melissa.Ronaldo@usdoj.gov

Dated at Burlington, Vermont this 28th day of March, 2018.

> By:     */s/ Craig S. Nolan*_____
>           Craig S. Nolan, Esq.
>           SHEEHEY FURLONG & BEHM P.C.
>           30 Main Street, 6th Floor
>           P.O. Box 66
>           Burlington, VT  05402-0066
>           (802) 864-9891
>           cnolan@sheeheyvt.com

12